David E. JOHNSON and Susan Johnson, Plaintiffs,

v.

CHESEBROUGH–POND'S USA CO., Defendant.

No. 3:92 CV 247 (GLG).

United States District Court, D. Connecticut.

March 18, 1996.

Farren and King, by Susan King Shaw, New Haven, CT, for Plaintiffs.

Cummings & Lockwood, by Frank H. Czajkowski, Paul E. Knag, Kevin D. O'Leary, Stamford, CT, for Defendant.

GOETTEL, District Judge.

Defendant Chesebrough–Pond's USA Co. brings this motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, seeking judgment on all eight counts of plaintiffs' complaint. For the reasons stated below, defendant's motion (Document # 65) is granted.

## BACKGROUND

In January 1990, plaintiff David Johnson ("Johnson") was employed in Pennsylvania on a long-term assignment through a temporary agency. His employer appeared to have sufficient work to support his placement until the end of 1990, and there was a possibility of a permanent position. Johnson was contacted by a recruiter about a position at defendant Chesebrough–Pond's USA Co. ("Chesebrough–Pond's") in Connecticut. He traveled to Connecticut and, before interviewing for the position, he completed and signed an application for employment, one paragraph of which provided that employment with defendant was employment-at-will.

During his interview, Johnson was told by personnel employee Bruce DeMayo that the position he was interviewing for was a new position, manager of a new engineering group the company was starting. Johnson also met with Dana Duncan ("Duncan"), the director of engineering who would be his direct supervisor. Johnson was offered the position on July 12, 1990.

During a telephone conversation with Duncan on July 19, 1990, Johnson expressed concern regarding job security issues. He explained that he feared that after relocating his family, he would be laid off due to a plant closing, corporate reorganization or other similar event. Explaining that layoffs had been a concern at the last four places he had worked, Johnson inquired whether nine months notice or severance pay could be given in the event of a layoff. Duncan responded that there would be no guarantees with respect to notice or severance. Duncan explained, however, that there was "at least five years worth of work just to do the strategic plan now" involving the new engineering group. Duncan also explained that Unilever, the parent company, had many different companies in the United States, and that there was a possibility of other positions with these companies in the event of a plant closing. Finally, Duncan told Johnson that Chesebrough–Pond's was good to people. Johnson recorded these comments in his notes.

Before accepting the job offer, Johnson also inquired about the stability of the Chesebrough–Pond's facility. Chesebrough–Pond's had been acquired by Unilever approximately three years before, and Johnson inquired whether the "Unilever transition" was over. In response, Duncan indicated that the transition was over. Duncan did not disclose the possibility of other plant closings, and did not inform Johnson that he had been recently relocated because of a plant closing. Duncan also told Johnson that Chesebrough–Pond's was a "profit center" for Unilever. Johnson accepted defendant's offer of employment on August 13, 1990.

Duncan's dissatisfaction with Johnson's job performance was not expressed until a December 1990 meeting. Although plaintiffs deny such a discussion, defendant alleges that Duncan advised Johnson that it was necessary for Johnson to make better use of the staff available to him and to make better use of his own time. Still dissatisfied with the situation, in January of 1991, Duncan became actively involved in the management of Johnson's group. During a January 11, 1991 meeting, defendant alleges that Duncan

again expressed concern to Johnson about Johnson's job performance. Duncan advised Johnson that he was on unwritten probation, and that Duncan's concerns were serious. Duncan explained that it was necessary to see improvement quickly. Plaintiffs deny the occurrence of this discussion during their January 11, 1991 meeting.

On March 13, 1991, Johnson and Duncan met to discuss Johnson's performance appraisal. Duncan expressed his continued concern about Johnson's performance, and notified Johnson that he had "three months to improve or else." On March 14, 1991, Johnson met with Bruce DeMayo ("DeMayo"), a personnel employee. Johnson expressed concern about the treatment he was receiving from Duncan. DeMayo told Johnson that he had previously told Duncan to give Johnson "due process," including an explanation of what was wrong, what was wanted, and the time frame that would be allowed to correct the problem. DeMayo told Johnson that if Johnson and Duncan could not reach agreement, the next step would be to talk with Duncan's supervisor. Johnson was also told that he would be allowed to put a written response in his personnel file.

On March 27, 1991, Duncan and Johnson met for five hours to discuss Johnson's performance. Although unclear from either party's account of this meeting, some part of the conversation involved a discussion of "workaholics." The next day, Johnson put on Duncan's desk a newspaper article concerning the effect of "workaholics" on their subordinates. Some sentences of the article were highlighted.

As an alleged result of the newspaper article, Duncan concluded that in view of Johnson's reactions to Duncan's constructive criticism, Duncan could no longer work with Johnson. Duncan recommended his termination on the next working day, April 2, 1991. The recommendation was accepted and Johnson was advised that he was being terminated for poor performance. Plaintiffs allege Johnson was then escorted out of the building "like a criminal."

Johnson requested that his termination be reconsidered. He spoke with James McCall ("McCall"), Vice President for Personnel and

Public Relations in defendant's corporate headquarters. Johnson submitted a written explanation of his concerns on October 22, 1991. McCall ultimately concluded in a written response that the company's actions were justified. He concluded, "I believe that had you not been terminated on April 2, that the work relationship between you and Dana (Duncan) would have worsened and the work of the department would have suffered."

Johnson and his wife, Susan Johnson, then filed this lawsuit alleging a number of different theories of recovery based upon Johnson's acceptance of employment and his eventual termination from defendant.[1] Defendant now moves for summary judgment on all eight counts of plaintiffs' complaint.

## DISCUSSION

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In order to successfully oppose this motion, plaintiffs must produce sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Plaintiffs have not met this burden. As a federal court sitting in diversity jurisdiction, we of course apply state substantive law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Applying Connecticut law to the undisputed facts establishes that defendant is entitled to judgment as a matter of law on all eight counts.

### 1. Fraudulent Misrepresentation

The plaintiffs have alleged in the first and second counts of the complaint that the defendant made fraudulent and/or negligent misrepresentations to Johnson in an attempt to induce him to leave his current employment, to accept employment with defendant, and to relocate his family to Connecticut.

Under Connecticut law, to state an action for fraudulent misrepresentation, plaintiffs must allege that: "(1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made with the intent of inducing reliance thereon; and (4) the other party relied on the statement to his detriment." *Billington v. Billington*, 220 Conn. 212, 217, 595 A.2d 1377, 1379 (1991). Damages resulting from fraudulent misrepresentations need be proven by a "preponderance of the evidence." *Kilduff v. Adams, Inc.*, 219 Conn. 314, 330, 593 A.2d 478, 487 (1991). All other elements must be proven by the higher standard of "clear and satisfactory evidence." *Id.; see also id.* at 327 n. 14, 593 A.2d at 486 n. 14 (discussing the justification for requiring a more exacting burden of proof in fraud actions).

Plaintiffs also allege negligent misrepresentation. "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know or has the duty of knowing the truth." *D'Ulisse–Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 217, 520 A.2d 217, 223 (1987) (citations omitted). In order to succeed on this claim, plaintiffs must prove that defendant failed to exercise reasonable care or competence in obtaining or communicating information to Johnson on which he relied to his detriment. *Id.* at 219–220, 520 A.2d at 224.

In order to recover for either fraudulent or negligent misrepresentation, plaintiffs must allege injury that is the direct and proximate result of the alleged misconduct. *Chanoff v. U.S. Surgical Corp.*, 857 F.Supp. 1011, 1017 (D.Conn.), *aff'd*, 33 F.3d 50 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994); *see gener-*

---

**1.** While plaintiffs assert most possible attacks on the employment-at-will doctrine, they do not allege any federal employment discrimination claims since Johnson's age, sex, race, etc. apparently do not qualify for any of these.

*ally Revak v. SEC Realty Corp.*, 18 F.3d 81, 90 (2d Cir.1994) ("Like any cause of action sounding in negligence, negligent misrepresentation requires a showing of proximate cause"). "The damages to be recovered . . . [must be] the natural and proximate consequence of the fraudulent representation complained of; and those results are proximate which must be presumed to have been within the contemplation of the defendant as the probable consequence of his fraudulent representations." *Kilduff*, 219 Conn. at 323–324, 593 A.2d at 484, quoting *Kornblau v. McDermant*, 90 Conn. 624, 632, 98 A. 587 (1916).

 Proximate cause is more than "but for" causation. Thus, in addition to showing that but for defendant's alleged misrepresentations plaintiff would not have suffered his asserted damages, plaintiffs must also show that the misstatements were the reason plaintiffs suffered these damages. *See First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). "Furthermore, when factors other than the defendant's fraud are an intervening direct cause of a plaintiff's injury, the same injury cannot. be said to have occurred by reason of the defendant's actions." *Id.* These requirements make clear that even if plaintiffs could establish that Mr. Duncan's representations were false, they could not succeed in proving that these representations were the proximate cause of their injuries.

The alleged misrepresentations do not involve the reasons for Johnson's termination. Plaintiffs claim that Johnson was misinformed about several aspects of the job vacancy he eventually filled and about the company. They claim that Johnson was told the position was a "new" position although the duties of this position were allegedly performed by a former employee. Plaintiffs also claim that Johnson was not told or was misinformed about corporate activities that might involve plant closings, transfers, and/or lay-offs. Finally, plaintiffs claim that Johnson was misinformed that defendant was a "profit center" when in fact it had not met its annual financial goals. Many of these alleged misrepresentations were elicited from Duncan as responses to Johnson's concerns about job security.

Johnson claims that had he known the truth about these misrepresentations, he never would have accepted the position with defendant. Plaintiffs assert in their complaint that the damages resulting from their reliance on these misrepresentations include "loss of income, career opportunities, benefits, bonuses and other perquisites of employment and has suffered humiliation and mental anguish and embarrassment." Plaintiffs are apparently arguing: but for these misrepresentations, Johnson would not have accepted the job; but for his acceptance of the job, Johnson would not have been terminated from it; and but for his termination, plaintiffs would not have suffered these injuries relating to the loss of his employment. This alleged causation is not sufficient to impute liability to defendant.

 Even if Duncan had intentionally misinformed Johnson, those fraudulent misrepresentations were not the proximate cause of Johnson's termination.[2] Johnson was terminated because of Duncan's opinion about his job performance. Johnson's job performance was the intervening direct cause of his termination. Because we find that the alleged misrepresentations were not the proximate cause of Johnson's damages, plaintiffs cannot adequately state a claim for fraudulent or negligent misrepresentation. The first and second counts of the complaint are therefore dismissed.

**2. *Implied Contracts***

 In the fifth count of their complaint, plaintiffs allege that defendant's oral repre-

---

2. Defendant maintains that there were no misrepresentations. We need not resolve that issue, which may involve triable issues of fact. If plaintiffs were alleging injuries resulting from Johnson's acceptance of the job position, as opposed to injuries resulting from his termination, proximate cause for any misrepresentations may exist. Plaintiffs have not alleged any evidence, however, to support the existence of such injuries. The asserted injuries resulting from plaintiff's alleged reliance on any misrepresentations all appear to have resulted from Johnson's termination.

sentations of July 17, 1990 [3] constituted promises of job longevity and security which the defendant should reasonably have expected to induce action or forbearance on the part of plaintiffs. Plaintiffs allege that defendant's conduct toward plaintiff constituted a breach of contract, including a breach of the implied covenant of good faith and fair dealings.

Plaintiffs assert the existence of this implied contract based on Duncan's alleged promises of job longevity and security. In response to Johnson's concerns regarding job security, Duncan stated that there were no guarantees, but that there was "at least five years worth of work just to do the strategic plan now." Duncan also stated that in the event of totally unforeseen circumstances, Unilever had a lot of different companies within the United States and other positions would be very possibly available, and that defendant was good to people. Plaintiffs argue that "Mr. Johnson came away from the conversation with Mr. Duncan thrilled because he had been given absolute assurances that he would be taken care of by Chesebrough–Pond's and that these assurances abrogated the at-will employee clause in the employment contract."

 Even viewing the inferences to be drawn from the facts in the light most favorable to plaintiffs, *see Matsushita Electric Industrial Co., supra,* plaintiffs' conclusion that these statements constituted absolute assurances of job security and longevity are unjustified. Johnson read and signed an application for employment with defendant which clearly stated that he would be an employee-at-will. One paragraph of the application stated:

> I also understand that nothing contained in this employment application or in the granting of an interview is intended to create an employment contract between the COMPANY and myself or to provide any other benefit. I understand that employment with the COMPANY is an employment-at-will. I agree that if I am employed by the COMPANY, I will be an employee at will, unless different terms are agreed to in writing by the President of the COMPANY or an officer of the COMPANY designated by him for that purpose. I also agree that as an employee-at-will, I have the right to terminate my employment without cause and without notice at any time and the COMPANY also has this right.

A reasonable juror could not conclude from the evidence asserted in support of the fifth count that this agreement had been abrogated. This agreement clearly requires a writing to alter the employment-at-will. Because plaintiffs have not alleged the existence of such writing, we dismiss the fifth count of plaintiffs' complaint.[4]

We also dismiss the third count of the complaint. Plaintiffs allege the existence of an express or implied contract based on the defendant's March 26, 1991 performance appraisal memorandum and the comments of defendant's employees regarding this memorandum. Plaintiffs allege that Johnson was told he would be given three months to improve his poor performance before being terminated, that Johnson would be entitled to "due process" in discussions about his poor

---

**3.** Although the complaint identifies July 17, 1990 as the date of these discussions, plaintiffs' other papers state the date of his telephone conversation with Duncan as July 19, 1990.

**4.** Both the third and fifth counts of plaintiffs' complaint allege a breach of the implied covenant of good faith and fair dealing encompassed within the asserted express or implied contracts specified in these counts. Because we fail to find the existence of either contract, these covenants encompassed within such contracts likewise do not exist.

Connecticut law, however, recognizes a breach of the implied covenant of good faith and fair dealing implicit in an at-will employment relationship. An at-will employee can only recover on such a claim if the employee can show that the employer violated public policy in the firing of an employee. *See Lark v. Post Newsweek Stations Connecticut, Inc.,* No. CV 94 070 53 26, 1995 WL 491290, at *1 (Conn.Super.Ct.1995), *citing Magnan v. Anaconda Industries, Inc.,* 193 Conn. 558, 479 A.2d 781 (1984) and *Carbone v. Atlantic Richfield Co.,* 204 Conn. 460, 470, 528 A.2d 1137, 1142 (1987) (where "an employment contract is clearly terminable at will, ... a party cannot ordinarily be deemed to lack good faith in exercising this right."). Plaintiffs do not allege the violation of any public policy, and therefore, we dismiss both alleged breaches of this implied covenant.

performance and have an opportunity to appeal to his supervisor's boss, and that Johnson would be provided with an opportunity to make a written statement to his personnel file. Plaintiffs assert that defendant breached the express or implied contracts created by these statements.

■ As discussed above, verbal assurances of "due process" do not constitute the creation of an express or implied contract in light of the employment application's language to the contrary. The application clearly stated that Johnson could be terminated without cause and without notice.

■ Plaintiffs allege, however, that in addition to the verbal assurances, Johnson was promised in a March 26, 1991 memorandum that he would be given three months to improve his performance before he was terminated. Duncan wrote, "[t]his will serve as notice to you that your job performance is unacceptable and must improve within three months." This statement could not be reasonably construed as creating a contract for continued employment.[5] As Johnson admitted in deposition, the memorandum was a "threat." As threats, not promises, these statements do not change Johnson's status as an at-will employee. We therefore also dismiss the third count of the complaint.

3. *Negligence*

■ In the fourth count, plaintiffs allege that defendant was negligent in failing to follow its own procedures, in failing to give Johnson the opportunity to correct his allegedly poor performance, in failing to provide due process and in acting unreasonably and imprudently. Connecticut does not recognize such negligence causes of action.

In *Morris v. Hartford Courant Co.*, 200 Conn. 676, 513 A.2d 66 (1986), the Connecticut Supreme Court held that recovery would not be allowed based on a claim of negligent investigation of alleged misconduct of an at-will employee. Other Connecticut courts have since rejected claims for negligent performance appraisal, *Burnham v. Karl &*

Gelb, P.C., No. 537069, 1995 WL 12522 (Conn.Super.Ct.1995), and negligent discharge, *Schmidt v. Yardney Electric Corp.*, 4 Conn.App. 69, 492 A.2d 512 (1985); *Wormley v. Blue Cross & Blue Shield of Connecticut, Inc.*, No. 31 40 88, 1992 WL 361490 (Conn.Super.Ct.1992); *Pace v. Bristol Hospital*, No. CV 94–0461146S, 1994 WL 669595 (Conn.Super.Ct.1994). Because Connecticut does not recognize such a cause of action, we dismiss the fourth count of plaintiffs' complaint.

4. *Defamation*

■ In the sixth count of their complaint, plaintiffs allege that Johnson was defamed in his business or profession as a result of allegations of poor performance. A plaintiff alleging defamation must prove that "the defendants published false statements that harmed the plaintiff and the defendants were not privileged to do so." *Kelley v. Bonney*, 221 Conn. 549, 563, 606 A.2d 693, 701 (1992).

Plaintiffs do not identify specific defamatory statements in support of their defamation claim. In the complaint, plaintiffs allege that they have been defamed by "allegedly poor performance reviews and other statements regarding the plaintiff's performance in his business or profession, both written and oral, as made and published by the defendant through its servants, agents and/or employees, [that] were false and malicious." In his deposition, Johnson identified defendant's documents dated March 26, 1991 and April 1, 1991 as the statements he relied upon for his claim of defamation. In addition, in his opposition to this motion, plaintiffs state that they also rely upon negative statements that defendant's agents made to recruiters after his termination.

■ The documents dated March 26, 1991 and April 1, 1991 are internal company reviews of Johnson's performance. Both documents were written by Duncan and detail Duncan's opinions regarding Johnson's job performance. Duncan's opinions are not false statements sufficient to state a claim for

---

5. Plaintiffs do not allege the existence of a company policy or employee manual requiring three

months probation prior to termination.

defamation.[6] *See Perruccio v. Arseneault,* 7 Conn.App. 389, 394, 508 A.2d 831, 834 (1986) (holding that an assertion of "dictator leadership" was not defamatory because it was an opinion); *Torok v. Proof,* No. CV 90 0113204, 1993 WL 28878, at *2 (Conn.Super.Ct.1993) (holding that an assertion that plaintiff was "not a good accountant" not defamatory). Likewise, Johnson's allegation that he was defamed by statements made to recruiters is also without merit. Johnson argues in his opposition to this motion that "negative statements" were made to recruiters, including statements that Johnson "didn't fit in" and that Johnson "could not be recommended." Again, any such statements were matters of opinion, not false statements. In addition, the only evidence plaintiffs have presented regarding these statements is Johnson's own deposition testimony that the statements were made. Such hearsay is not sufficient to raise an issue of fact for summary judgment purposes. *See Johnson v. NCB Collection Services,* 799 F.Supp. 1298, 1301 (D.Conn.1992). We therefore dismiss the sixth count of plaintiffs' complaint.

### 5. *Intentional Infliction of Emotional Distress*

In the seventh count of the complaint, plaintiffs allege the intentional infliction of emotional distress. In order to assert such a claim, the plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337, 1342 (1986).

Because we find that defendant's alleged conduct was not "extreme and outrageous," we do not address the other three elements. Whether the defendant's conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the court. *Mellaly v. Eastman Kodak Co.,* 42 Conn.Supp. 17, 597 A.2d 846 (1991). Only where reasonable minds differ does it become a question for the jury. *Id.,* citing *Reed v. Signode Corp.,* 652 F.Supp. 129, 137 (D.Conn.1986); 1 Restatement (Second) of Torts § 46, comment (h). The general rule "is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Mellaly,* 42 Conn.Supp. at 19–20, 597 A.2d at 847, quoting W. Prosser & W. Keeton, *Torts* § 12 at 60 (5th ed. 1984).

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Id.* quoting 1 Restatement (Second), Torts § 46, comment (d).

Plaintiffs argue that they have "alleged numerous disputed factual issues regarding the manner in which Mr. Johnson was treated during his tenure with the defendant, including his sudden termination and being physically escorted from the building like a criminal." We find that as a matter of

---

**6.** To the extent plaintiffs are alleging that Johnson was defamed by intracorporate communications, we also note that such communications are protected by a qualified privilege. While these communications may constitute publication, *see Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 27–28, 662 A.2d 89, 103 (1995), plaintiffs must show the lack of a privilege. "[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege." *Id.* at 29, 662 A.2d at 103. This privilege, however, must not be abused. *Id.* at 28, 662 A.2d at 103. Whether the privilege was abused depends upon whether there was malice in fact in uttering and broadcasting the alleged defamatory matter. *Charles Parker Co. v. Silver City Crystal Co.,* 142 Conn. 605, 615, 116 A.2d 440, 445 (1955). Because Duncan's statements are not defamatory, we need not address whether plaintiffs have sufficiently set forth evidence to support an abuse of this privilege.

law, defendant's alleged conduct does not rise to the level of extreme and outrageous conduct. At most, the alleged conduct establishes that Johnson was an at-will employee who was terminated because his direct supervisor believed his performance was unsatisfactory. While the methods by which Johnson's performance was reviewed and by which he was eventually terminated may not have been ideal employment practices, they do not constitute "extreme and outrageous" conduct. We therefore dismiss the seventh count of plaintiffs' complaint.

### 6. *Negligent Infliction of Emotional Distress*

The eighth count of plaintiffs' complaint alleges negligent infliction of emotional distress. To prove such a claim, plaintiffs must establish that the defendant "knew or should have known that its conduct involved an unreasonable risk of causing emotional distress, and that the distress, if it were caused, might result in illness or bodily harm." *Buckman v. People Express, Inc.,* 205 Conn. 166, 173, 530 A.2d 596, 600 (1987).

Plaintiffs have not set forth sufficient facts to establish that defendant created an unreasonable risk of causing emotional distress. Additionally, plaintiffs have failed to allege or prove that the alleged emotional distress might result in illness or bodily harm. *See Morris v. Hartford Courant Co.,* 200 Conn. 676, 682–83, 513 A.2d 66, 69–70 (1986). We therefore dismiss the eighth count of plaintiffs' complaint.

### 7. *Loss of Consortium*

The first five counts of plaintiffs' complaint include loss of consortium claims. Because we dismiss the underlying tort claims, we also dismiss the loss of consortium claims. *See Hopson v. St. Mary's Hospital,* 176 Conn. 485, 408 A.2d 260 (1979).

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Document # 65) is GRANTED. The clerk will enter judgment for the defendant.

**SO ORDERED.**