Patsy J. KELLY, Plaintiff,

v.

CITY OF MERIDEN, Elizabeth Vumbaco, Caroline Ware, Rosemary McCormick, Defendants.

No. Civ. 397CV02571AVC.

United States District Court, D. Connecticut.

Sept. 27, 2000.

Thomas W. Bucci, Willinger, Shepro, Tower & Bucci, Bridgeport, CT, for Plaintiff.

Christopher P. Hankins, Deborah Leigh Moore, Corporation Counsel's Office, Meriden, CT, for Defendants.

### *RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

COVELLO, Chief Judge.

This is an action for damages and equitable relief. It is brought by the plaintiff, Patsy J. Kelly, an allegedly aggrieved elementary school social worker to redress a municipality's decision to discharge her from her employment on account of her admission that she was living with the noncustodial father of two children to whom she had provided social services. Kelly alleges violations of her constitutional right to freedom of intimate association and seeks damages pursuant to 42 U.S.C. § 1983. She further alleges violations of common law precepts concerning defamation and tortious interference with an employment relationship.

The defendant municipality, City of Meriden, and the individually named defendants, Elizabeth Vumbaco, Caroline Ware, and Rosemary McCormick, now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, asserting that there are no genuine issues of material fact, and that they are entitled to judgment as a matter of law. The issues presented are: 1) whether Kelly has raised a genuine issue of material fact that the defendants violated her Constitutional right to intimate association; 2) whether Kelly has raised a genuine issue of material fact that one of the individual defendants herein, Rosemary McCormick, slandered her; and 3) whether there is evidence sufficient to sustain a cause of action for tortious interference with an employment relationship. For the reasons hereinafter that follow, the court concludes that the defendants are entitled to judgment as a matter of law on the Constitutional claim and the common law cause of action for tortious interference with an employment relationship. Kelly has, however, raised a genuine issue of material fact that she was slandered by McCormick. Accordingly, the motion is granted in part and denied in part.

## FACTS

Examination of the amended complaint, affidavits, pleadings, Rule 9(c) statements, exhibits and supplemental materials accompanying the motion for summary judgment, and the responses thereto, discloses the following undisputed, material facts.

On September 5, 1985, the plaintiff, Patsy J. Kelly was hired by the municipal defendant herein, the City of Meriden, as an elementary school social worker. In this capacity, Kelly provided social services to various students enrolled in non-public schools in Meriden and, most recently, St. Mary's Elementary School.

One Carlos Izquierdo was the non-custodial father of two children who attended St. Mary's Elementary School. Kelly provided counseling services to the Izquierdo children in connection with a state proceeding in which the childrens' paternal grandparents became their guardians. Kelly spent time socializing with Izquierdo and his children outside of St. Mary's, including attending picnics, movies and clubs, and visiting the children's paternal grandparents. In or around July of 1997, Kelly invited Izquierdo to move into her home.

On September 5, 1997, one Mary Surowiecki, the Head Teacher at St. Mary's Elementary School, asked Kelly if she was living with Izquierdo. Kelly responded in the affirmative and told Surowiecki that it was a personal matter. Surowiecki later reported the conversation to Kelly's municipal supervisor, the defendant, Rosemary McCormick. McCormick telephoned Kelly and asked her if she was having a sexual relationship with Izquierdo. Kelly responded that the relationship was a bartering relationship.

On September 11, 1997, McCormick sent a memo to one Caroline Ware ("the Ware memo"). Ware is Meriden's director of personnel and an individual defendant herein. In the Ware memo, McCormick stated, among other things, that

> [t]he present complaint is the latest and by far the most serious of the complaints I have received regarding the behavior of Patsy Kelly during the course of the past year. These complaints question Patsy Kelly's judgment and professionalism in specific cases and circumstances.

Further, the memo reported that McCormick had recently discussed with Kelly the importance of maintaining professional boundaries and, in particular, the Izquierdo family situation. During the discussion, Kelly had said nothing about living with Izquierdo and, even went so far as to state that she planned to maintain clear, professional boundaries with Izquierdo. Because Kelly did not, at that time, divulge her relationship to Izquierdo, McCormick concluded that Kelly had lied, causing her to

question Kelly's judgment and professionalism. Finally, McCormick concluded the Ware memo with:

> [t]he present complaint is the most serious and public of other incidents. There exists another clear example of Patsy Kelly's over involvement, lack of professional boundaries and impaired judgement [sic] which I will detail if necessary.

On September 11, 1997, McCormick sent a second memo to Ware reporting on a conversation she had with two other social work professionals, i.e., one Steven Karp, the Executive Director of the National Association of Social Workers, and one Sally Tomezak, Clinical Supervisor for Child Guidance ("the Ethics memo"). According to the Ethics memo, McCormick provided Karp and Tomezak with her understanding of the Izquierdo complaint, describing the relationship as either a rental arrangement between Kelly and Izquierdo, or, alternatively, an intimate relationship. Based on either scenario, Karp and Tomezak concluded that the situation constituted a clear violation of the Code of Ethics for Social Workers.

Further, in the Ethics memo, McCormick stated that,

> [s]ince this complaint has been filed I have become more aware of other incidents in Patsy Kelly's work in which boundaries have been violated and in which the best interests of children and parents have not been served.

On September 12, 1997, McCormick asked Kelly to attend an investigative meeting concerning her relationship with Izquierdo. Kelly attended, as did Ware and the defendant, Elizabeth Vumbaco, Meriden's director of health. During the meeting, Ware asked Kelly about the degree of intimacy existing between her and Izquierdo, and in particular, whether Kelly lived in a two bedroom home.

At the conclusion of the meeting, Vumbaco placed Kelly on administrative leave and furnished her with notice of a pre-termination hearing set for September 16, 1997. In the notice, Vumbaco informed Kelly that the City of Meriden would seek to terminate her employment because:

(1) Kelly allowed Izquierdo, the father of two children she served, to use her personal vehicle;

(2) Kelly allowed Izquierdo, the father of two children she served, to take up residence in her home;

(3) Kelly may have compromised the National Association of Social Workers Code of Ethics by—

(a) failing to avoid conflicts of interest;

(b) taking unfair advantage of a professional relationship to further personal needs, i.e., the need for rental income;

(c) engaging in a dual or multiple relationships with a client in which there is a risk of exploitation or potential harm to the client;

(4) Kelly's actions brought discredit upon municipal service and, because the social worker-client relationship is largely based on trust, Kelly's actions created the risk of hindering other school social workers in the performance of their work, all in violation of section 10.3 of Meriden's personnel policies and procedures.

(5) Kelly used her position for personal gain by renting a room in her house to Izquierdo, the father of two children she served, after she made recommendations to Izquierdo concerning his living situation and working arrangements; and

(6) Kelly failed to notify her supervisor about her relationship with Izquierdo, knowing that the relationship might cause a conflict even after school officials discussed the matter with her.[1]

1. The September 12, 1997 notice has been modified here for clarity and simplicity.

In addition, the notice concluded with the following:

> This is not the first time that an issue regarding poor judgment regarding involvement with a client's family has been brought to your attention by your supervisor. Additionally, your characterization of the situation and events has not always been truthful or accurate. Your ability to distinguish your role as a social worker with the city and any other roles you serve in the community or your personal life and the ability of the staff, clients and parents you serve to see those boundaries clearly drawn, goes to the very heart of your employment and you have violated this.
>
> You may present any evidence which controvenes [sic] the above statements at our meeting on Tuesday [September 16, 1997].

*Notice of Pre–Termination Hearing* (dated September 12, 1997).

Due to a scheduling conflict, Kelly's attorney could not attend the pre-termination hearing and so Kelly requested an adjournment. The request was subsequently denied and Kelly refused to attend without her attorney. On September 17, 1997, Vumbaco sent a letter to Kelly terminating her employment based upon the same reasons set forth in the notice of pre-termination hearing.

Kelly has submitted her employment evaluations indicating that over the last twelve years, her supervisors rated her job performance as excellent. There is also no evidence that Kelly was subjected to any disciplinary proceedings up until the Izquierdo complaint. There is, however, evidence that during the previous year, Kelly was involved in a situation at St. Lawrence Elementary School in which, according to McCormick, the principal had reported that Kelly had violated professional boundaries.

Further, McCormick's deposition transcript offers evidence indicating that, contrary to several of the statements made by McCormick in the Ware memo and the Ethics memo: (1) no complaints were filed against Kelly during the year preceding the Izquierdo complaint; (2) the Izquierdo complaint may not have been the most serious and public of other incidents; and (3) for the exception of the St. Lawrence School incident, there were no other reports indicating that Kelly had violated professional boundaries or failed to serve the best interests of children.

Although Steven Karp, the Executive Director of the National Association of Social Workers, advised McCormick that, in his opinion, Kelly had violated the code of ethics for social workers—advice reflected in McCormick's Ethics memo—Karp acknowledged in his deposition that his statement was just an opinion and that, without fact finding and peer review, Kelly could not be found to have violated the code.

## STANDARD

Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. See *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). A plaintiff raises a genuine issue of material fact if "the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56 "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Liberty Lobby, supra,* at 247–48, 106 S.Ct. 2505 (emphasis original). The Supreme Court has noted that:

Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims ... [and] it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett*, 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## DISCUSSION

1. *Constitutional Right to Freedom of Intimate Association and 42 U.S.C. § 1983.*

The defendants first move for judgment as a matter of law with respect to Kelly's claim that they violated her Constitutional right to freedom of intimate association, arguing that because Kelly never told them that she was engaged in an intimate sexual relationship with Izquierdo and, in fact, told them that she was engaged in a bartering relationship with Izquierdo, there is no evidence that she was discharged her on account of her intimate relationship with Izquierdo. Alternatively, the defendants assert that, even if they did violate Kelly's Constitutional rights, they are entitled to qualified immunity and thus, judgment as a matter of law.

Kelly responds that the circumstances surrounding the termination clearly raise a genuine issue of material fact that she was terminated for engaging in an intimate sexual relationship with Izquierdo. These circumstances include: 1) the defendants repeated inquiries as to the degree of intimacy existing between Kelly and Izquierdo; 2) McCormick's request for an ethical opinion concerning Kelly's relationship with Izquierdo, wherein McCormick specifically inquired as to the propriety of an intimate relationship; and 3) the fact that, indeed, Kelly was living with Izquierdo at the time of her termination.

■ For purposes of summary judgment, the court must assume all disputed facts in the light most favorable to Kelly, that is, that the defendants terminated her employment on account of her decision to live intimately with Izquierdo. The court also assumes, without deciding, that living together under the facts presented here (as opposed to marriage) is the sort of intimate association protected by the Constitution.[2] Even with these assumptions, Kelly is not entitled to relief.

■ The right to intimate association is protected by both the First Amendment and the Due Process Clause of Fourteenth Amendment to the Constitution. *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir.1999). Where the state seeks to penalize an employee with loss of a job on account of the employee's intimate relationship with another, the First Amendment, and not the Due Process Clause, is the proper Constitutional vehicle through which an aggrieved employee may seek redress. *See Id.* at 44.

**2.** The Constitution does not recognize a generalized right of social association. The right to intimate association generally will not apply to business relationships, chance encounters in dance halls, or paid rendezvous with escorts. *Sanitation and Recycling Industry, Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir.1997). The right extends to relationships that "attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Id. (quoting Roberts v. United States Jaycees*, 468 U.S. 609, 619, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984)). "Whether the right extends to other relationships depends on the extent to which those relationships share the characteristics that set family relationships apart—small, select, and secluded from others." *Id.*

The First Amendment protects freedom of expression and intimate association. *Board of Directors of Rotary Intern. v. Rotary Club of Duarte*, 481 U.S. 537, 545–47, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987). That protection, however, is not absolute. *Board of Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). Its force weakens when the citizen who claims to have suffered the Constitutional loss is a public employee, and the government defends its action in the name of the public good. *Shahar v. Bowers*, 114 F.3d 1097, 1101 (11th Cir.1997). In such circumstances, courts are required to seek a balance between the interests of the employee in the intimate association, as a citizen, against and the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. *Adler*, 185 F.3d at 44 (*quoting Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). This is known as the *Pickering* balance. *Id.* In striking this balance, "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters v. Churchill*, 511 U.S. 661, 675–76, 114 S.Ct. 1878, 1888, 128 L.Ed.2d 686 (1994). Consequently, deference must be accorded the state's reasonable assessment of its interests. *Board of County Comm'rs, Wabaunsee County*, 518 U.S. 668, 116 S.Ct. 2342, 2349, 135 L.Ed.2d 843 (1996). In similar cases, courts have upheld in the face of a First Amendment challenge the transfer of a sheriff's secretary to a less desirable job based on her marriage to an officer in sheriff's department, *McCabe v. Sharrett*, 12 F.3d 1558, 1569–70 (11th Cir.1994), and the punishment of police officers by their municipal employer for dating and cohabitation. *Shawgo v. Spradlin*, 701 F.2d 470, 482–83 (5th Cir.1983).

In deciding this case, the court is willing to accord Kelly's claimed associational right substantial weight. But her right must yield to the interests of the City of Meriden if the city has articulated a reasonable basis for her discharge. The court is persuaded that such a reasonable basis exists. As set forth in the September 17, 1997 termination letter, Vumbaco discharged Kelly because Kelly had allowed Izquierdo, the father of two children she served, to use her personal vehicle and to take up residence in her home. The character of the relationship, as Kelly has asserted here, was intimate. Vumbaco concluded that Kelly may have violated the National Association of Social Workers Code of Ethics by failing to avoid conflicts of interest, by taking unfair advantage of a professional relationship to further personal needs, and by engaging in a dual or multiple relationships with a client in which there is a risk of exploitation or potential harm to the client. These conclusions are reasonable under the circumstances, and are entitled to deference. While the defendants did not engage in fact finding or peer review prior to rendering the above conclusions, none were required. *See, e.g., Waters v. Churchill*, 511 U.S. 661, 673–81, 114 S.Ct. 1878, 1887–90, 128 L.Ed.2d 686 (1994) (for the *Pickering* balance, facts to be weighed on government's side merely need to be a reasonable view of the facts or reasonable predictions; a manager's view of the circumstances is entitled to substantial weight). Moreover, it was not unreasonable for Vumbaco to conclude that Kelly's actions brought discredit upon municipal service and, because the social worker-client relationship is largely based on trust, it was not unreasonable for Vumbaco to conclude that Kelly's actions created the risk of hindering other school social workers in the performance of their work. Finally, the court cannot say that the defendants' concern over Kelly's judgment and professionalism was unreasonable, especially in light of the undisputed fact that Kelly's characterization of the Izquierdo situation has not al-

ways been truthful,—even the papers filed here indicate inconsistencies in Kelly's characterization of the Izquierdo relationship, i.e., Kelly has described the relationship as a bartering relationship in several previous instances, but has argued here that it was an intimate relationship. For these reasons, the court cannot say that Kelly's discharge was unreasonable. Given the substantial weight that must be accorded the state interests, the court concludes that, as a matter of law, Kelly has failed to demonstrate a Constitutional violation.

### 2. *Defamation/Slander*

Kelly next asserts that the defendant, McCormick, slandered her through the publication of the Ware memo and the Ethics memo. Specifically, Kelly claims that McCormick made false and defamatory statements in her memoranda, all for the purpose of causing her public ridicule and humiliation. The alleged defamatory statements include:

1.  [t]he present complaint is the latest and by far the most serious of the complaints I have received regarding the behavior of Patsy Kelly during the course of the past year. These complaints question Patsy Kelly's judgment and professionalism in specific cases and circumstances. [Ware Memo].

2.  [t]he present complaint is the most serious and public of other incidents. There exists another clear example of Patsy Kelly's over involvement, lack of professional boundaries and impaired judgement [sic] which I will detail if necessary. [Ware Memo].

3.  [s]ince this complaint has been filed I have become more aware of other incidents in Patsy Kelly's work in which boundaries have been violated and in which the best interests of children and parents have not been served. [Ethics Memo].

Kelly asserts that statement (1) is false and defamatory because it speaks to multiple complaints during the past year when, in fact, no other complaints were filed. Kelly asserts that statement (2) is false and defamatory because, like statement (1), the clear tenor of the statement is that Kelly was involved in multiple incidents that caused McCormick to question her professionalism and judgment. At her deposition, McCormick could only cite one other such incident, i.e., the St. Lawrence School incident. Finally, Kelly asserts that statement (3) is false and defamatory because, like the other two statements, the statement implies that Kelly was involved in multiple incidents of violating professional boundaries and failing to serve the best interests of children. At her deposition, McCormick could not substantiate her statement with anything more than the St. Lawrence School incident.

McCormick responds that a qualified privilege immunizes her memoranda from suit and that, in any event, Kelly has failed to produce any evidence of malice, a required element of a cause of action for defamation. The court concludes that Kelly has raised a genuine issue of material fact with respect to her claim of defamation/slander.

■ In order to establish a cause of action for defamation under Connecticut law, the plaintiff must prove that "the defendant published false statements that harmed the plaintiff, and that the defendant was not privileged to do so." *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 27, 662 A.2d 89 (1995). "Communications between managers regarding the review of an employee's job performance ... are protected by a qualified privilege." *Id.* at 29, 662 A.2d 89; *see also Johnson v. Chesebrough–Ponds USA Co.*, 918 F.Supp. 543, 551–52 n. 6 (D.Conn.1996) (same). If a defendant shows entitlement to the privilege, "it will be presumed that the communication, though defamatory, was made in good faith and without malice in fact." *Victoria*

*II v. O'Neill,* 688 F.Supp. 84, 91 (D.Conn. 1988). "Thus, once an occasion of privilege is found, it is plaintiff's burden to rebut the presumption of good faith. This rebuttal is accomplished by showing malice in fact in uttering and broadcasting the alleged defamatory matter." *Johnson,* 918 F.Supp. at 552 n. 6 (*citing Charles Parker Co. v. Silver City Crystal Co.,* 142 Conn. 605, 615, 116 A.2d 440 (1955)). "The actual malice sufficient to destroy this immunity is shown where the defendant utters the statement with knowledge that it was false or with reckless disregard of the truth or falsity of the facts stated." *Moriarty v. Lippe,* 162 Conn. 371, 387, 294 A.2d 326, 335 (1972). The plaintiff is required to come forward with solid circumstantial evidence of malice to overcome summary judgment. *Victoria II,* 688 F.Supp. at 91.

■ Here, each of the alleged defamatory statements were contained in communications between managers regarding the review of Kelly's job performance, and are entitled to a qualified privilege. Because, however, Kelly has demonstrated through McCormick's deposition testimony that, in fact, McCormick could not substantiate with any facts her statements that Kelly had been involved in multiple other unprofessional incidents, the court concludes that Kelly has raised a genuine issue of material fact the McCormick knew the statements were false at the time she made them, or, at the least, that McCormick made the statements with a reckless disregard for their truth. The court, therefore, finds that circumstantial evidence of malice exists and, accordingly, the motion for summary judgment with respect to this cause of action is denied.

### 3. *Tortious Interference with Employment Relationship*

Kelly next asserts that the defendant, McCormick, tortiously interfered with her employment relationship with the City of Meriden when she drafted the Ethics memo and presented it to Ware, all for the purpose of having Kelly terminated.

McCormick responds that McCormick is entitled to judgment as a matter of law because Kelly has failed to offer any evidence that McCormick was acting for her own benefit when she drafted and distributed the Ethics memo. The court agrees with McCormick.

■ The Connecticut Supreme Court "has long recognized a cause of action for tortious interference with contract right or business actions." *Blake v. Levy,* 191 Conn. 257, 260, 464 A.2d 52 (1983). It is well settled, however, that this cause of action only lies when a third party adversely affects the contractual relations of two other parties. *Wellington Sys. v. Redding Group,* 49 Conn.App. 152, 168, 714 A.2d 21 (1998). "Where the alleged tortfeasor is an agent of one of the contracting parties, and thus indirectly a party of the contract, there can be no liability for such interference." *Taylor v. Maxxim Medical, Inc.,* No. 3:99cv338 (AHN), 2000 WL 630918, *3 (D.Conn. March 23, 2000). "[A]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable for breaching its own contract." *Malik v. Carrier Corp.,* 202 F.3d 97, 109 (2d Cir.2000). Hence, an agent acting on behalf of the principal can only be liable if the plaintiff alleges and proves that the agent used his power improperly for his own benefit and that the benefit to the principal played no role in his actions. *Id.* at 109. In other words, the plaintiff must allege and produce evidence that the agent used his power for personal gain. *Bowman v. Grolsche Bierbrouwerij B.V.,* 474 F.Supp. 725, 733 (D.Conn.1979).

■ Applying these principles here, McCormick is entitled to judgment as a matter of law because Kelly has failed to allege or produce any evidence that McCormick distributed the Ethics memo

**200**

for personal gain. Accordingly, the court grants McCormick's motion for summary judgment on the claim of tortious interference with an employment relationship.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED in part and DENIED in part (document no. 49). In the interest of judicial economy, the court shall retain jurisdiction over the common law cause of action concerning defamation. *See* 28 U.S.C. § 1367(c); *Itar–Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 446–47 (2d Cir.1998).