Sylvia WALKER, Plaintiff,

v.

AMR SERVICES CORP., Defendant.

No. CV 94–4510(RJD).

United States District Court, E.D. New York.

July 31, 1997.

Raymond Nardo, Mineola, NY, for Plaintiff.

Elise M. Bloom, Jackson, Lewis, Schnitzler & Krupman, New York City, for Defendant.

DEARIE, District Judge.

Defendant AMR Services Corporation ("AMRS") has moved for summary judgment, seeking dismissal of plaintiffs claims of sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000(e), as amended ("Title VII").[1] Alternatively, defendant moves to strike plaintiffs prayer for compensatory and punitive damages. For the reasons articulated below, defendant's motion is denied.

### Background

Plaintiff Sylvia Walker began working full-time at AMRS on May 5, 1993 as a Cargo Freight Agent. Walker Dep. 44, 54. She worked the night shift (6:00 p.m. to 2:00 a.m.) while simultaneously working full-time (8:00 a.m. to 5:00 p.m.) at Burghart Shipping. *Id.* at 53, 374–75. Kenneth St. Louis was one of three night shift supervisors at AMRS. *Id.* at 53–54.

Plaintiff alleges that St. Louis sexually harassed her throughout July and August, 1993 by engaging in the following conduct:

while driving plaintiff home from work, St. Louis complained, on approximately five occasions, that he was not happy at home and wanted to start over with a new woman, Walker Dep. 68–69;

while driving plaintiff home from work, St. Louis told plaintiff they would make a good couple; plaintiff stated that she wasn't interested, *id.* at 74–75;

at work, St. Louis told plaintiff that she "look[ed] good from behind" and that she made it difficult to work when she wore jeans on Sundays,[2] *id.* at 64, 77–78;

at work, St. Louis told plaintiff, "You're a very hard-working person. The both of us could make a good couple," *id.* at 63;

at work, St. Louis arrived with his face bandaged and swollen after a car accident and told plaintiff that he would not appear that way if his wife cared about him, *id.* at 69–70;

while driving plaintiff home from work, St. Louis told plaintiff he left his wife for one and one half years but returned because of his daughter, *id.* at 72;

at work, St. Louis complained about his ill-fitting pants and told plaintiff that "If I had a woman home, she would know that

my pants needed to be hemmed properly," *id.* at 69–70;

after St. Louis heard plaintiff was relocating, St. Louis repeatedly offered to help her move; plaintiff declined St. Louis' offers, *id.* at 66, 96–99;

at a holiday cook-out at plaintiffs home, St. Louis told plaintiff that her daughter looked at him because she knew he would be her future stepfather, *id.* at 64;

while driving plaintiff home from work one day, St. Louis slowed the car down, lunged towards Walker, and exclaimed, "I want to be all over you." plaintiff rebuffed St. Louis' assault by springing up and asking "What are you doing?" *Id.* at 65, 103. St. Louis drove off, stating to plaintiff "Good things can happen to you at AMR" if she gave him a chance. *Id,* at 65–66.

After this last incident, plaintiff ceased riding home with St. Louis, except for one occasion in September when she was unable to obtain car service. *Id.* at 100, 117–20. In addition, a co-worker told plaintiff that St. Louis "had the hots for" her. *Id.* at 64.

Plaintiff also charges that she was retaliated against for refusing to indulge St. Louis' sexual advances. St. Louis allegedly refused plaintiffs request for a day off when her son was taken to the emergency room, even though there was ample staff coverage in the department, *id.* at 137–43; required plaintiff (and only plaintiff) to stay at work late on Monday nights and perform work that could have been done earlier in the shift, *id.* at 151–52; eavesdropped on plaintiffs private telephone conversations, *id.* at 169–75; requested that plaintiff go to the import department when she was not scheduled to do so, *id.* at 191–93; and repeatedly stared at plaintiff during working hours. *Id.* at 206–10.

Plaintiff also avers that AMRS retaliated against her by fabricating two incidents of alleged insubordination which led to her termination. The first incident occurred on Oc-

---

1. Plaintiff has also asserted related claims under the New York State Human Rights Law and the New York City Human Rights Law. Defendant does not directly address those claims in its motion.

2. Employees were permitted to "dress down" on Sundays. St. Louis Dep. 39–40.

tober 17, 1993, when plaintiff asked another freight agent to photocopy a document. The Lead Agent, Marie Young–Adma, who St. Louis also supervised, yelled "It's not fair," and proceeded to page St. Louis. When St. Louis appeared, Young–Adma told St. Louis that plaintiff refused to answer a question. St. Louis Dep. 55. Plaintiff denied this claim, and St. Louis refused to listen to her explanation and immediately disciplined her. Walker Dep. 144–46; St. Louis Dep. 60.

Sensing that she was being "set up," plaintiff requested a meeting on October 19, 1993 with Terminal Manager D'Apice, Supervisor St. Louis, and Yadera Matos, a cargo freight agent with whom plaintiff had previously discussed St. Louis' sexual advances. Walker Dep. 222. At the meeting, plaintiff recounted St. Louis' alleged sexual harassment, and Matos told D'Apice that plaintiff had informed her of St. Louis' alleged actions at an earlier date. D'Apice Dep. 32; Matos Dep. 22–24. D'Apice believed that there was not enough evidence to determine whether these claims were well-founded. D'Apice Dep. 52. D'Apice did not interview St. Louis, plaintiff or any co-worker about the incidents. D'Apice Dep. 83. Although he removed St. Louis from a direct supervisory responsibility over plaintiff and placed a letter in St. Louis' file, D'Apice concluded that St. Louis did not sexually harass plaintiff and that no discipline was necessary. D'Apice Dep. 54.

The second incident of alleged insubordination occurred on October 20, 1993, the day after Ms. Walker complained of sexual harassment. Within ten minutes of Walker's arrival at work, a stranger approached her as she was inputting data at a computer terminal. Walker Dep. 259–60. The man asked plaintiff to report to the import department to complete a freight transaction Plaintiff responded "Could you give me a second?", apparently to save her work on the computer. *Id.* at 255–56. The stranger began yelling, and plaintiff "immediately" reported to the import department. *Id.* Plaintiff later learned that the stranger was Clarence Blades, a supervisor who worked on the day shift. Subsequent to this incident, Blades wrote Ms. Walker up for "insubordination," alleging she waited "1 minute and 20 sec-

onds" before reporting to the import department. Blades Dep. 42–44. Plaintiff denies waiting this long. Walker Dep. 255–56. Blades and D'Apice discussed the incident, and Blades signed a form terminating Walker on October 28, 1993, nine days after Walker had complained about the alleged sexual harassment.

AMRS argues that Blades acted independently, terminating Walker without knowledge of her sexual harassment claims. Blades Dep. 53, 55. Prior to terminating Walker, Blades reviewed her record, which contained a write-up of the incident with Young–Adma, and some tardiness notations, but did not mention her sexual harassment complaint. *See* Exhibit E to Bloom Affidavit.

Following her termination on October 28, 1993, plaintiff filed charges of sexual harassment and retaliation with the New York State Division of Human Rights ("DHR"). The DHR found "probable cause" that discrimination had occurred, and plaintiff commenced the instant action, alleging hostile work environment, *quid pro quo* sexual harassment, and retaliatory discharge. She seeks $1 million in compensatory damages and $5 million in punitive damages.

*Discussion*

A motion for summary judgment should be granted only where "there is no genuine issue as to any material fact." Fed. R. Civ. Pro. 56(c). In evaluating these motions, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

1. *Hostile Work Environment*

■ To prevail on a Title VII hostile environment claim, a plaintiff must show that the alleged sexual harassment was sufficiently severe or pervasive to alter the conditions of her employment. *Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct.

2399, 2405–06, 91 L.Ed.2d 49 (1986); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995). Defendant alleges that the challenged conduct was, "at worst, occasional sexual comments, gestures or remarks," that were insufficient to create a sexually hostile work environment as a matter of law. *See, e.g., Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief "). The Court does not adopt defendant's characterization of the challenged conduct as "episodic." Plaintiff cites more than a dozen incidents over a two month period, including an assault in a vehicle, lascivious comments directed at her appearance, and a promise to confer job benefits if she acceded to her supervisor's sexual advances.

The Second Circuit has rejected attempts to dismiss harassment claims based on the isolated nature of the challenged acts. In fact, the Second Circuit has ruled that harassment was severe and pervasive where, for one month, a plaintiff was subject to unwelcome assault, innuendo and ridicule. The court held that:

> A female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII. It is not how long the sexual innuendoes, slurs, verbal assaults, or obnoxious course of conduct lasts. The offensiveness of the individual actions complained of is also a factor to be considered in determining whether such actions are pervasive.

*Carrero v. New York City Housing Authority*, 890 F.2d 569, 578 (2d Cir.1989). Surely, over a two month period, unprovoked comments such as "I want to be all over you," "Good things can happen to you at AMR" or "the both of us could make a good couple," if true, sufficiently altered the conditions of plaintiffs employment and may be considered by a reasonable jury to qualify as severe or pervasive harassment.

■ AMRS also argues that plaintiff cannot recover for the alleged harassment because it was not unwelcome. *See Meritor Sav. Bank*, 477 U.S. at 68, 106 S.Ct. at 2406 ("the gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome."); *Kotcher*, 957 F.2d at 62 (stating that harassment must be not only "severe or pervasive," but also unwelcome). AMRS points out that plaintiff continued to ride home with St. Louis even after he allegedly began making harassing comments, and that she even invited him to her house for a barbecue while this conduct was ongoing. However, plaintiff discontinued the rides home with St. Louis immediately after the incident when he allegedly lunged at her in the car and said "I want to be all over you." She rode with him on only one subsequent occasion, when she could not obtain car service to get home. Plaintiff invited St. Louis to her house, where she lived with her mother, for a Fourth of July barbecue while this alleged harassment was occurring. Walker Dep. 118. The Court concludes that a genuine issue of material fact exists as to whether the alleged conduct was unwelcome.

■ Defendant further argues that the harassment, even if proven, cannot be imputed to AMRS. The Second Circuit has traditionally relied on common law agency principles in assessing an employer's liability for a supervisor's harassment. *See Kotcher*, 957 F.2d at 63. The *Kotcher* court held that, in order to impute a supervisor's conduct to an employer, "a plaintiff must prove that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* The Second Circuit recently refined this requirement, holding that an employer may be held liable for harassment perpetrated by one of its supervisors if:

a. the supervisor was at a sufficiently high level in the company, or

b. the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship, or

c. the employer provided no reasonable avenue for complaint, or

d. the employer knew (or should have known) of the harassment but unreasonably failed to stop it.

*Torres v. Pisano*, 116 F.3d 625, 633 (2d Cir. 1997). St. Louis was one of three supervisors on plaintiffs shift at AMRS, and he therefore may have been at a sufficiently high level in the company for his actions to be imputed automatically to AMRS. Nevertheless, this is a difficult line to draw, *see id.*, and it is not necessary to rely on St. Louis' managerial position in order to impute his actions to the employer. The Court is persuaded, in any event, that plaintiff has presented sufficient facts that St. Louis used his "actual or apparent authority to further the harassment." Specifically, plaintiff alleges that St. Louis said "good things can happen to you at AMR" if she gave him a chance, Walker Dep. 65–66; refused her request for a day off when her son was taken to the emergency room, *id.* at 137–43; required her to stay at work late, *id.* at 151–52; and requested that plaintiff go to the import department when she was not scheduled to do so. *Id.* at 191–93. At the least, there are issues of fact as to whether St. Louis used his authority as her supervisor to further the harassment and alter the conditions of plaintiffs employment.

 Defendant argues that it cannot be held liable for creating a hostile work environment because, upon learning of plaintiffs complaints, AMRS took "prompt remedial action." *See Kotcher*, 957 F.2d at 63 (holding that employer is not liable for supervisor's misconduct unless it provided no reasonable avenue for complaint or knew of supervisor's misconduct but did nothing about it). D'Apice reprimanded St. Louis for his conduct, relieved him of supervisory responsibilities for plaintiff, and threatened termination if any further incidents arose. However, "[a]n employer cannot disclaim liability for [a supervisor's harassing] conduct based on a post-harassment investigation," *Tomka*, 66 F.3d at 1307 n. 8. Plaintiff has alleged sufficient facts to withstand defendant's motion for summary judgment on the hostile work environment claim.

## 2. Quid Pro Quo Sexual Harassment

 Under a *quid pro quo* theory, a plaintiff/employee must establish that

she was denied an economic benefit either because of gender or because a sexual advance was made by a supervisor and rejected by her. If a plaintiff can show that she has suffered an economic injury from her supervisor's actions, the employer becomes strictly liable without any further showing of why the employer should be responsible for the supervisor's conduct. The supervisor is deemed to act on behalf of the employer when making decisions that affect the economic status of the employee.

*Kotcher*, 957 F.2d at 62 (citing *Meritor*, 477 U.S. at 64–65, 106 S.Ct. at 2404–05). Plaintiffs *quid pro quo* claim is premised on her allegations that St. Louis said that "good things could happen" to plaintiff if she acceded to his demands, and that she was singled out for negative treatment after refusing to accede. Walker Dep. 65, 99, 143. Defendant's assertion that "there is no nexus between plaintiffs alleged refusal to respond to St. Louis' advances and any affect on tangible aspects of plaintiffs terms, conditions or privileges of employment," Def. Mem. 21, does not override the factual assertions made by plaintiff. Plaintiff claims she was singled out for discriminatory treatment, as she allegedly was denied a request for a day off when her son was taken to the emergency room, required to stay late on Mondays to do work that could have been done earlier and sent to the import department when she was not scheduled to work there. Walker Dep. 137–43, 151–52, 169–75, 191–93. Plaintiff alleges she was subjected to months of advances and harassing comments, and she was terminated two months after rejecting the advances and one week after complaining of them. These allegations raise the reasonable inferences that plaintiffs reaction to the harassment affected tangible aspects of the terms and conditions of her employment, and that her rejection of her supervisor's advances caused tangible job detriments. No additional showing is necessary to justify an employer's liability for a supervisor's actions in *quid pro quo* claims, as the employer is

deemed strictly liable. *Kotcher,* 957 F.2d at 62; *see also Torres,* 116 F.3d at 633 (stating that liability for supervisor's *quid pro quo* sexual harassment is always imputed to employer).

### 3. *Retaliation Claims*

■ In order to establish a claim of retaliation, plaintiff must show:

a. participation in a protected activity known to the defendant;

b. an employment action disadvantaging the plaintiff; and

c. a causal connection between the protected activity and the adverse employment action.

*Tomka,* 66 F.3d at 1308. There is no dispute that plaintiff has met her burden on the first two of these elements. She complained of the alleged harassment to D'Apice, which is sufficient to satisfy the first prong. *See Kotcher,* 957 F.2d at 65 (holding that internal complaints to company management concerning sexual harassment constitute protected activity). Second, plaintiff was disadvantaged when she was terminated on October 28, 1993. Defendant argues, however, that plaintiff cannot show a causal connection between her complaint to D'Apice and her dismissal, and asserts that "timing in and of itself is insufficient to establish a retaliation claim." However, the Second Circuit has clearly recognized the relevance of timing in evaluating the causal element of a retaliation claim. In *Tomka,* the court held that "the timing of . . . [a] letter [terminating the employee's benefits] supports an inference of discrimination sufficient to establish a prima facie case." 66 F.3d at 1308. Similarly, in *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980), the Second Circuit held that "[a]s for the third element [of a retaliation claim], courts have recognized that proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment." The event giving rise to plaintiffs termination occurred the day after she complained to D'Apice; she was terminated nine days later. Accordingly, defendant cannot credibly assert that there is no genuine issue of material fact

regarding whether retaliation was a motivating factor behind plaintiffs termination.

Defendant also argues that Blades, not D'Apice, made the decision to terminate plaintiff, and that Blades was unaware of her sexual harassment complaints. However, a reasonable fact-finder could determine that St. Louis may have been a force behind the incident with Blades and plaintiffs termination. Some features that support this possibility include:

a. the alleged incident of insubordination involving Blades occurred the day after plaintiff complained of sexual harassment and within ten minutes of plaintiffs arrival at work, Walker Dep. 259–60;

b. Blades and St. Louis were friends, St. Louis Dep. 13–14;

c. Blades did not work on the same shift as plaintiff and had never spoken to her until the day after she complained of sexual harassment, Walker Dep. 254; Blades Dep. 28, 32;

d. Blades and St. Louis spoke prior to Blades "turning over" the shift, St. Louis Dep. 89;

e. Blades cannot recall the name of any other employee he has terminated for insubordination, Blades Dep. 55.

Moreover, the events surrounding the second incident of alleged insubordination, which led immediately to plaintiffs termination, are disputed. Plaintiff explicitly contradicts Blades' version of the incident, as she maintains that it took her "about a second" to respond, while defendant maintains that one minute and twenty seconds elapsed. D'Apice Dep. 57–58. Plaintiffs version of events is independently corroborated by the statement of a co-worker, Anthony Brown, who was present when this incident occurred and who submitted a statement to AMRS officials. D'Apice Dep. 61.

Triable issues of fact also surround the first incident of alleged insubordination, in which she alleges St. Louis was overly harsh in responding to the complaint of Lead Agent Young–Adma.

### 4. Compensatory and Punitive Damages

Defendant asserts that no reasonable fact-finder could award plaintiff damages for alleged emotional distress. To recover such damages, a plaintiff must present:

a. credible testimony with respect to the claimed mental anguish; and

b. corroboration, either by competent medical proof or by the circumstances of the case which afford some guarantee of the genuineness of the claim.

*Selbst v. Touche Ross & Co.*, 116 F.R.D. 665, 667 (S.D.N.Y.1987). According to plaintiff, she suffered depression and sleepless nights for a period of two years after her termination. Walker Dep. 414–18. She claims that the harassment was "in [her] thoughts almost every day," and that she lost trust in her supervisors and experienced uncontrolled loss of appetite. *Id.* at 14–17, 422. Compensatory damages are available in Title VII actions. 42 U.S.C. § 1981 a(b)(2). Plaintiffs claims of depression, insomnia, and psychological pain, if proven, may support an award of such damages.

Defendant also challenges plaintiff's claims for punitive damages, arguing that it did not engage in "discriminatory practices with malice or with reckless indifference to [plaintiffs] federally protected rights." *See* 42 U.S.C. § 1981a(b)(1). The Second Circuit has upheld significant punitive damages awards in similar cases of gender discrimination. *See Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir.1997) (affirming punitive damages awarded in Title VII case). There is no basis to dismiss plaintiffs punitive damages claim at this stage of the litigation. For the foregoing reasons, defendant's motion for summary judgment is denied.

SO ORDERED.