Judith DOBRICH, Plaintiff,

v.

GENERAL DYNAMICS CORP.,
ELECTRIC BOAT DIVISION,
Defendant.

No. 3:96CV01672(GLG).

United States District Court,
D. Connecticut.

Feb. 28, 1999.

92

Robert B. Muchinsky, Hartford, CT, for plaintiff.

Roger W. Lehr, Jr., General Dynamics/Electric Boat Division, Groton, CT, David L. Metzger, Metzger & Richters, Hartford, CT, for defendant.

### OPINION

GOETTEL, District Judge.

This is an employment discrimination action brought by plaintiff, Judith Dobrich, against her former employer, the Electric Boat Division of General Dynamics Corporation, in which she claims that she was discriminated against on the basis of her gender, age, and disability, and retaliated against and discharged because of her objection to these practices. She has asserted claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), as well as pendant state claims for intentional infliction of emotional distress and negligent supervision. Defendant has moved for summary judgment on all counts of plaintiff's complaint [**Doc. # 19**]. For the reasons set forth below, defendant's motion is granted in part and denied in part.

### SUMMARY JUDGMENT STANDARD

A motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. The burden of demonstrating the absence of a genuine dispute as to a material fact rests with the party seeking summary

judgment, in this case defendant Electric Boat. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In assessing the record to determine whether there are any genuine issues of material fact, this Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997) (citations omitted).

Additionally, the Second Circuit has held that a district court should exercise particular caution when deciding whether summary judgment should issue in an employment discrimination case. *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir.1994). Because writings directly supporting a claim of intentional discrimination are rarely if ever found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *Id.*

Accordingly, we set forth the facts in the light most favorable to plaintiff.

### FACTS

Plaintiff was hired by Electric Boat on June 9, 1994, as a laborer at the Windsor Site Office. She was 50 years old at the time of hire. On January 4, 1996, at the age of 51, she was laid off, ostensibly as part of defendant's reduction in force. To understand the circumstances surrounding plaintiff's lay-off, some background on the Windsor Site facility is necessary.

*The Windsor Site Office*

Electric Boat is the division of General Dynamics that designs and builds nuclear submarines for the United States Navy. The Windsor Site Office, where plaintiff worked, was developed in the 1950's by the U.S. Department of Energy and the Naval Nuclear Propulsion Program to house a prototype nuclear reactor for a particular class of submarines. The site was operated until approximately 1991, when it was closed. In 1993, Knolls Atomic Power Laboratory, which had been operating the facility, initially contracted with Electric Boat to stabilize the plant, and, then in 1995, to completely deactivate and dismantle the reactor and demolish all structures on the site. The project was called "Return to Green Fields," because when the project is completed there will be no evidence that the site ever existed.

Because this was a demolition project, the footprint of the Windsor Site continually decreased and, accordingly, the type of work being done on the jobsite and the types of craftsmen needed for this work also changed. At the beginning of the project, there had been 16 buildings. By January, 1996, when plaintiff was laid off, only three remained, although a number of temporary buildings had been erected outside the fenced enclosure.

Because of the nature of the project, at its inception, anyone entering the site had to have a U.S. Department of Energy Security Clearance, which took about six months to process. However, with the demolition of existing structures, in October, 1995, the Department of Energy downgraded the security status of the Windsor Site, requiring security clearance in only the most sensitive areas of the project. This change greatly increased the number of craft employees eligible for hire, since in most instances they no longer needed security clearance.

In 1993, when Electric Boat accepted the contract for the Windsor Site project, it executed an industry-wide craft labor agreement, the General Presidents' Project Maintenance Agreement ("GPPMA"), which governed all union-represented employees on the job site regardless of their trade union affiliation. Under the GPPMA, Electric Boat was required to hire from the local union hiring halls and to designate a working leader (foreman)

for each local union. The union foreman was responsible for work assignments and for ensuring that assigned work was completed, but the foreman had no authority to hire, fire, suspend, discipline, formally evaluate performance or adjust grievances. At the time of plaintiff's hire as a laborer, the labor foreman was Dennis McCann, and Andrew Moeckel, the boilermaker foreman, was designated as the general foreman, responsible for overall coordination of craft assignments. Mr. Moeckel could also "write up" employees for disciplinary procedures and could make recommendations for lay-offs. Plaintiff maintains that, although the union foremen were not part of corporate management, they were part of the "chain of command."

*Plaintiff's Employment*

In June, 1994, plaintiff was hired out of the local laborers' hiring hall along with three other individuals to move furniture from the buildings being demolished at Windsor Site. Although plaintiff had no prior experience doing manual labor,[1] she possessed the necessary security clearance, which was something few laborers possessed. This work proved too physically demanding for her, and she was reassigned to lighter duty work including janitorial work and "High Rad Watch" work, monitoring access to high radiation areas, for which there was a significant need at the beginning of plaintiff's employment.[2]

*Plaintiff's Disability*

On August 24, 1994, plaintiff injured her right wrist at work when a co-worker allegedly kicked a chair on rollers at her. (The co-worker has denied this). Initially, the injury did not cause plaintiff to miss any work. However, her wrist grew progressively more painful and, in December 1994, she was placed on various medical restrictions for a period of three weeks. From February 16, 1995, to May 1, 1995, plaintiff was out of work because of her wrist, which required surgery in March 1995. She returned to work in May 1995, with a 30-pound lifting/40-pound pushing restriction on her right hand and a 5% partial permanent disability rating for her right wrist.

Notwithstanding these limitations, plaintiff testified that she was able to perform her assigned work until the time of her lay-off. Since the time of her lay-off, plaintiff has worked off and on as a laborer for other employers on other jobs.

*Defendant's Reduction in Force*

In October, 1995, Electric Boat was running behind schedule on the demolition of Building I at the Windsor Site and hired ten additional laborers to empty two floors of this building. Because the majority of the Site had been declassified such that security clearances were no longer required, only one of the laborers hired had a security clearance.

These additional hires caused the project to go over budget and, in January, 1996, with only three buildings remaining, Electric Boat decided to lay off eleven craft workers, including seven laborers. Plaintiff was one of the individuals that was chosen for lay-off.

According to Mr. Moeckel, the general foreman who recommended which laborers

---

**1.** Plaintiff listed her prior work experience as ten years in sales and sales management, three years consulting in human resources and professional placement, interior design work, a degree in theology, and an effective communicator and motivator. Plaintiff explains that she applied for the job with Electric Boat because, at the time, Connecticut was in a recession and jobs of the type that she had previously held were difficult to come by. She needed a job and believed that working for a large company would provide job stability and good benefits. She states that it was her intent to eventually request a transfer to a clerical position with defendant.

**2.** plaintiff describes her duties as primarily consisting of "cleaning the toilets, tagging pipes containing PCB's, cleaning the dry pool area (a radiation area), perform[ing] guard-type duty in high-radiation areas, and other miscellaneous duties, such as cleaning the teamsters' office and distributing supplies." (Pl.'s Aff. at ¶ 5).

to lay off, plaintiff was the "obvious first choice" for lay-off. She had no manual labor experience prior to being hired by defendant; she had problems with the physical requirements of the job; defendant's need for janitorial work had significantly declined with the demolition of most of the buildings on site; and the work scheduled for the upcoming months consisted of heavy demolition work, increasing the need for persons with heavy equipment experience, which plaintiff did not have.

The two other laborers who performed primarily janitorial work were also chosen for lay-off, and, after January 1996, no laborer was assigned primarily to do cleaning work. The union collective bargaining agreement, the GPPMA, did not require lay-offs to be based upon seniority. The final decision regarding lay-offs was made by Mr. Roger LaCourse, the manager of production.

Plaintiff states that her name was not on the initial list of individuals to be laid off and that her name was added later. Indeed, plaintiff states that she was assured by management, as late as December 1995, that she was not going to be laid off. She believes that she was chosen for lay-off in part because of her disability, because defendant had recently requested her medical records relating to her wrist injury. Emmett Harper, head of human relations, confirmed that plaintiff's name was not on the original list but stated that, because she had already filed a charge of discrimination against Electric Boat, he felt that he needed clearance from the legal department before laying her off. Moreover, the site nurse, who requested plaintiff's medical records in December, 1995, explained that the records were needed to confirm plaintiff's work restrictions since the only restrictions contained in plaintiff's file had expired in July, 1995.

*Defendant's EEO Program and Employee Complaint Procedures*

Electric Boat had written procedures (Corporate Policies and Procedures, Standard Procedures, and Policy Statements) in their management manuals establishing and describing the Equal Employment Opportunity ("EEO") programs and employee complaint procedures. Defendant also had a staffed EEO office on the premises at the Windsor Site. New hires at Windsor, including plaintiff, went through an orientation program during which they were provided with an Employee Handbook and the Ethics Handbook, which described the EEO program and policy against sexual harassment and explained the employee complaint procedures. During plaintiff's employment, letters and memos regarding the company's EEO and sexual harassment policies were mailed to all employees, including plaintiff. Notices and memos were also posted on approximately ten bulletin boards. In March, 1993, all supervisors received four hours of EEO training, including two hours on sexual harassment.

Plaintiff was aware that if she had any problems, she should report them to Vicki Brown of human resources, and plaintiff did in fact report problems to her as well as to others, including union bull steward [3] Mark Penard, foreman Dennis McCann, general foreman Andrew Moeckel, assistant superintendent William Norton, superintendent Richard Barker, manager of production Roger LaCourse, site manager Steve Kelly, and the manager of human relations, Emmett Harper. Plaintiff testified, however, that subsequent to her initial complaints to Vicki Brown, she was told by Ms. Brown to refer her future complaints to the union bull steward instead of Ms. Brown.

*Plaintiff's CCHRO Complaints*

On May 12, 1995, plaintiff filed a complaint with the Connecticut Commission on

---

**3.** The union bull steward represented all union employees on the job site, regardless of union affiliation, to ensure that the employer fully complied with the provisions of the GPPMA.

Human Rights and Opportunities ("CCHRO"), alleging that she had been discriminated against on the basis of her age, gender, and disability. She based her claims on the following incidents.

During her orientation, her foreman Dennis McCann remarked to a co-worker: "What am I going to do with this fat, old woman?" Plaintiff was not a witness to this statement. It was reported to her by another co-worker. In July, 1994, the chair that plaintiff usually used in the lunchroom to prop up her swollen ankle was thrown and broken. Plaintiff reported this incident to the labor foreman and the bull steward with no results. In August, while she was cleaning the teamsters' office, the crane operator foreman became annoyed at her cleaning and kicked a chair at her (the incident mentioned above that caused her wrist injury). The circumstances of this injury were ultimately reported to the site nurse and to human resources. Plaintiff also complained that two of her male co-workers erected a partition at the laborers' assigned lunch table to block their view of her, and one of the men used a cup shaped like a woman's breast to drink liquid flowing from the nipple. She claimed that her second foreman would not speak to her and told her the reason was that she was a woman. When plaintiff was out of work recovering from her wrist surgery, she received a get well card from her co-workers, on which was printed the word "bitch," ostensibly referring to plaintiff. Another co-worker repeatedly called her a "dumb cunt" which he said was an acronym for "Can't Understand Normal Thinking." This latter incident was reported to human resources.

On June 16, 1995, plaintiff filed with the CCHRO a supplement to her affidavit, in which she added the following incidents. She complained that a male co-worker called her a "stupid kike" in the lunchroom, at a time when it was filled with her co-workers. That same employee on two other occasions pretended to pinch her breasts. On June 12, 1995, shortly after her first CCHRO complaint was filed and following a meeting between human resources and the employees named in plaintiff's complaint, plaintiff's work chair was slashed. She states that this time she feared for her safety and called the F.B.I., which in turn called the Windsor police. Plaintiff then reported the incident to Vicki Brown in human relations. Plaintiff was summoned to the guardhouse to meet the Windsor police officer and was later reprimanded by her supervisor for leaving her work area without notifying her supervisor. On another occasion, she was given a written warning by Vicki Brown for leaving her work site during an unofficial break time to go to the guard house to find out the name of the person who had questioned her the day before concerning her slashed chair. When plaintiff reported the chair slashing incident to Mr. Moeckel, the foreman, and told him that she was concerned that this was retaliation for her filing her CCHRO complaint, he allegedly responded: "What did you expect?"

On January 30, 1996, plaintiff filed with the CCHRO a second supplement to her affidavit, in which she complained that she had been fired in retaliation for filing a complaint with the CCHRO.

*Other Alleged Incidents*

In addition to these incidents, plaintiff alleges in this lawsuit that when she first started working for defendant she overheard a co-worker remark to a group of workers, referring to plaintiff, "did you see the big rack on her?" Plaintiff reported this to her foreman, who told her not to worry about it.

Another incident occurred in the fall of 1994, when a medical dummy, used for CPR demonstrations, was left on the floor of the lunchroom, covered with a blanket and with a rod or stick placed so that it would appear that the dummy had an erection. The dummy was left in a high traffic area and was not directed at plaintiff in particular. Shortly thereafter, plaintiff saw a picture of a vagina drawn on the boilermakers' lunch room tablecloth, which

she was required to clean. She does not know the perpetrator of either of these last two incidents.

In December, 1994, plaintiff was involved in a swearing incident with two male co-workers over an empty water jug that one of them was removing from the work area.

Plaintiff also cites to an incident that occurred some time before May 1, 1995, when a co-worker, waiting to clock in, yelled to another co-worker, Steve (with whom plaintiff was living and had been romantically involved): "Steve, are you getting any?" Plaintiff interpreted this remark to refer to Steve's having sexual relations with her.

Plaintiff also complains that, on three separate occasions while she was cleaning the men's restroom, a man came in and urinated in front of her. Plaintiff does not know who the first man was, the second man was a visitor, and the third was a co-worker. Plaintiff reported the third incident to the site manager.

Plaintiff also cites an incident in the summer of 1995, when another co-worker held a door closed so that she could not enter the room. In the fall of 1995, this same co-worker rubbed up against her on three different occasions. The third incident was reported to management, which reprimanded the co-worker involved. This same individual also remarked to plaintiff on several occasions that she smelled.

Plaintiff also complains about two yellow and black electrical posters on the worksite on which someone had drawn male genitalia. Plaintiff did not report this to management, instead removing the posters herself and taking them to her attorney.

## DISCUSSION

### I. Count I—Title VII—Sexually Harassment by Co-Workers

Plaintiff asserts in Count I of her complaint that defendant discriminated against her in the terms and conditions of her employment on the basis of her sex in violation of Title VII. More specifically, in her response to defendant's motion for summary judgment, she claims that she was subjected to "hostile environment sexual harassment" by her co-workers that altered the terms and conditions of her employment.

 In order to prevail on a hostile environment claim under Title VII, a plaintiff must establish two elements. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). First, she must prove that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted); *see also Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The hostile environment must be both subjectively and objectively offensive: one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. The Supreme Court in *Harris* instructed that a court should look to all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Id.* at 23, 114 S.Ct. 367. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283 n. 1, 141 L.Ed.2d 662 (1998). "[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere . . .—as well as evidence of specific hostility directed toward the plaintiff—is an important factor in evaluating the claim." *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997) (quoting *Hicks v. Gates Rubber Co.,* 833

F.2d 1406, 1415 (10th Cir.1987)) (internal quotations and emphasis omitted). The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *See, e.g., Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998). Thus, to prevail on a hostile work environment claim, the plaintiff must show that the workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment. *Gallagher v. Delaney,* 139 F.3d 338, 347 (2d Cir.1998); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995).

Second, the plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Perry v. Ethan Allen,* 115 F.3d at 149; *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995). This second element will be discussed more fully below.

## A. Was the harassment severe and pervasive?

In the instant case, construing the facts in plaintiff's favor, plaintiff was allegedly subjected to a variety of hostile incidents, including vulgar name-calling, unwanted physical touchings of a sexual nature, men urinating in front of her, sexual drawings and objects conspicuously displayed in the workplace, and acts of violence directed at her. Defendant does not dispute these facts, although it does disagree that these events rise to the level of a hostile work environment, given the context in which they occurred.

■ Plaintiff has testified that she felt threatened and frightened by these incidents. She claims to suffer from Post–Traumatic Stress Disorder and to have other emotional problems as a result. There is no evidence to refute her testimony concerning her subjective feelings.

Thus, plaintiff has satisfied the subjective component of establishing a hostile environment claim.

A hostile work environment claim also encompasses an objective component. Whether a reasonable person would objectively perceive this conduct to create a hostile work environment is a matter frequently left to the sound discretion of reasonable jurors. Evaluating the severity and pervasiveness of a harasser's conduct on summary judgment is often difficult and, in many cases, inappropriate. *Ponticelli v. Zurich American Ins. Group,* 16 F.Supp.2d 414, 429 (S.D.N.Y.1998); *DiLaurenzio v. Atlantic Paratrans, Inc.,* 926 F.Supp. 310, 314 (E.D.N.Y.1996); *see also Gallagher v. Delaney,* 139 F.3d at 342–43, 346 (noting the "dangers of robust use of summary judgment" in sexual harassment cases and the difficult problems of proof inherent in these cases).

Had the plaintiff's allegations of a hostile work environment included only occasional derogatory comments, we would find these objectively insufficient under the circumstances to meet the legal requirements for a hostile environment claim under Title VII. "For [sexist] comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of [sexual] enmity." *Schwapp,* 118 F.3d at 110 (citing *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986)) (internal quotations omitted). However, plaintiff has testified that there were a number of other significant acts of vandalism, physical touchings, and vulgar acts of a sexual nature directed toward her, as well as a number of sexually offensive drawings and objects displayed in the workplace that may or may not have been directed at her. Drawing all reasonable inferences in plaintiff's favor, a reasonable jury could find that the totality of the incidents of which plaintiff complains were sufficiently severe and pervasive to constitute a hostile work environment. Thus, for summary judgment purposes, we hold that plaintiff has satisfied the objective

component of the establishing a sexually hostile work environment.

**B.** *Is Defendant Liable for the Harassment?*

The more difficult question in this case is whether Electric Boat can be held liable for these acts of harassment perpetrated by plaintiff's co-workers.

■ A plaintiff pursuing a hostile environment claim must establish a basis, rooted in common-law agency principles, on which to hold an employer liable for the acts of its employees. *Gallagher*, 139 F.3d at 348 (citing *Meritor Sav. Bank*, 477 U.S. at 57, 106 S.Ct. 2399). The Second Circuit has held that employer liability for a hostile work environment created by co-workers attaches only when the employer has "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Murray*, 57 F.3d at 249 (citing *Kotcher*, 957 F.2d at 63); *see also Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 767 (2d Cir.1998); *Perry v. Ethan Allen*, 115 F.3d at 149; *Torres v. Pisano*, 116 F.3d 625, 634 (2d Cir.1997).

In this case, defendant argues that plaintiff's claim for sexual harassment must fail where, as here, the employer provided reasonable avenues of complaint, had a well-defined and well-disseminated policy against sexual harassment, and engaged in prompt remedial action one it received a complaint of sexual harassment. Plaintiff does not challenge the adequacy of defendant's policies against sexual harassment or the reasonableness of avenues of complaint. Contrary to defendant's assertions, however, plaintiff does challenge whether defendant's response to her complaints was sufficiently prompt and adequate.

Plaintiff has testified under oath that, although defendant had knowledge of the slashed chair incident, the human resources department failed to investigate it. She has also produced evidence that management and/or human resources was aware of the sexual vulgarities to which plaintiff was subjected, but either did not respond to many of these or brushed off plaintiff's complaints by attributing the language to "the nature of the workplace." It is also debatable whether human resources provided an adequate response to the incident involving plaintiff's co-worker's drinking from the nipple of a cup shaped like a woman's breast at the table to which plaintiff was assigned. According to plaintiff, the only response she received was that the incident had been investigated and that the cup was not intended to be used in that manner. Moreover, whatever the response, the alleged harassment did not stop and continued in one form or another throughout the eighteen months of plaintiff's employment.

The Second Circuit has held that "[i]f the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate." *Gallagher*, 139 F.3d at 348. Whether an employer has fulfilled its responsibility in this regard is to be determined from the facts of each case. Factors that may be considered include the gravity of the harm, the nature of the work environment, and the resources available to the employer. *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986). A jury in this case could disagree on how appropriately, effectively, and promptly the employer responded.

Defendant also argues that plaintiff should not be allowed to rely on incidents of discrimination that were not reported to defendant at the time they occurred through the complaint process defendant had in place. Defendant urges us to hold that, by not complaining, plaintiff waived any claim that these events contributed to the allegedly hostile environment. This position, however, is not in keeping with the Second Circuit's articulated standard for employer liability, *i.e.* that the employer failed to provide an adequate avenue for complaints *or* that the employer knew of the harassment and did nothing about it.

*Quinn v. Green Tree Credit Corp.*, 159 F.3d at 767. The Second Circuit has held that knowledge of the harassment may include constructive notice (*i.e.* that management should have known). *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996).

◼ As noted above, plaintiff states under oath that some of the incidents were reported and nothing was done or that the response was inadequate; other incidents that were not reported took place in common areas and arguably should have been observed by management without plaintiff's having to report them. Additionally, plaintiff has testified that, on at least one occasion, she was told by the head of human resources to refer her future complaints to the union bull steward, which could explain why some of the incidents were not reported. She also asserts that some of the incidents were inadequately investigated, with key witnesses not being interviewed.

At this summary judgment stage, plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether defendant took sufficiently prompt and remedial action to correct the harassment, which continued until the end of her employment. Accordingly, we find that summary judgment is inappropriate on this basis and deny defendant's motion for summary judgment as to Count I of plaintiff's complaint.

## II. Count II—Violation of the ADEA

◼ The ADEA prohibits an employer from terminating an employee because of her age. 29 U.S.C. §§ 623(a)(1), 631(a); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609–10, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (noting that Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes). The ADEA commands that employers are to evaluate older employees on the basis of their merits and not their age.

*Hazen Paper Co.*, 507 U.S. at 610, 113 S.Ct. 1701. Claims under the ADEA are analyzed in the same manner as claims under Title VII. *See Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 913 (2d Cir. 1997).

◼ Under the traditional burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in order to establish a *prima facie* case of discriminatory discharge in violation of the ADEA, a plaintiff must show, through direct or circumstantial evidence: (1) that she was within the protected age group; (2) that she was qualified for the position; (3) that she was discharged; and (4) that the discharge occurred under circumstances giving rise to an inference of discrimination. *Burger v. New York Institute of Technology*, 94 F.3d 830, 833 (2d Cir.1996). An ADEA plaintiff is not required to show that she was replaced by a younger employee. *Woroski v. Nashua Corp.*, 31 F.3d 105, 108 (2d Cir.1994). The burden that an employment discrimination plaintiff must meet to defeat a motion for summary judgment at the *prima facie* stage is *de minimis*. *McLee*, 109 F.3d at 134.

◼ Once the plaintiff has presented a *prima facie* case of discrimination, the defendant has the burden of articulating a legitimate, non-discriminatory reason for its actions. *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997). The employer's burden is one of production, not persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the employer articulates an age-neutral reason, in order to defeat a summary judgment motion, the plaintiff must then present admissible evidence from which a rational factfinder could infer that the defendant's employment decision was false or unworthy of belief and that its decision, more likely than not, was based in whole or in part on age. *Stern*, 131 F.3d at 312;

*Woroski,* 31 F.3d at 109; *Fisher v. Vassar College,* 114 F.3d 1332, 1339 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

In light of the ease with which a plaintiff can establish a *prima facie* case of discrimination and an employer can point to downsizing to justify any termination, ADEA suits arising out of a reduction in force often turn on whether the plaintiff has established that the rationale offered by the defendant was a mere pretext for age discrimination. *Viola v. Philips Medical Systems of North America,* 42 F.3d 712, 716 (2d Cir.1994). The Court must analyze the evidence, along with all reasonable inferences, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination. *Fisher,* 114 F.3d at 1347.

■ In this case, defendant has proffered a legitimate, nondiscriminatory reason for plaintiff's lay-off. *See Viola,* 42 F.3d at 717. It asserts that her termination was brought about by a reduction in force necessitated by budgetary concerns, and that plaintiff was selected for lay-off based upon a nondiscriminatory assessment of her qualifications in comparison to other laborers. Also, the work that plaintiff had performed was no longer as necessary to the remainder of the project. Defendant has produced a matrix that shows that laborers older than plaintiff were hired before and after her; younger laborers were laid off; and older laborers were retained. Additionally, the matrix shows that plaintiff had less experience than any other laborer, and had a lower rating in terms of her attitude and performance than all other laborers except one.

■ Once an employer has produced evidence of a nondiscriminatory rationale for its actions, the factual inquiry proceeds to a new level of specificity. *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. at 516, 113 S.Ct. 2742). To defeat a properly supported motion for summary judg-

ment, plaintiff must produce sufficient evidence to support a rational finding that the employer's proffered nondiscriminatory reason was false *and* that discrimination was the real reason. *Fisher,* 114 F.3d at 1339. Plaintiff need not show that age was the only reason she was terminated, only that age was a substantial factor in the decision. *Burger,* 94 F.3d at 833; *Levin v. Analysis & Technology, Inc.,* 960 F.2d 314, 317 (2d Cir.1992).

Plaintiff has offered no evidence whatsoever that her age was a substantial factor in defendant's lay-off decision. The only evidence plaintiff has produced relating to her age claim is the fact that she was over forty, which is not disputed, and the statement of a supervisor made to a co-worker when she was hired eighteen months earlier, referring to her as an "old lady." "[S]tray remarks in the workplace, by themselves, and without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment." *O'Connor v. Viacom Inc.,* No. 93 CIV 2399, 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23, 1996), *aff'd,* 104 F.3d 356, 1996 WL 722620 (2d Cir.1996).

A careful review of the substantial amount of evidence submitted by plaintiff in opposition to defendant's motion for summary judgment fails to raise a genuine issue of material fact as to whether the defendant's stated reasons for selecting her for lay-off were in fact a pretext for age discrimination. Thus, we hold that defendant is entitled to summary judgment on plaintiff's ADEA claim, Count II.

*III. Count III—ADA*

■ Plaintiff also alleges that she was discriminated against on the basis of her disability, that being her injured wrist, in violation of the ADA. The ADA prohibits an employer from discriminating against a qualified individual with respect to discharge, because of a real or perceived disability:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). In order to survive a motion for summary judgment on a discrimination claim under the ADA, a plaintiff must establish a *prima facie* case by producing sufficient evidence to support an inference of discrimination. *See Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir.1996); *Ryan v. Grae & Rybicki, P.C.*, No. 96 CV 3731, 1996 WL 680256, at *3 (E.D.N.Y. Nov. 13, 1996), *aff'd*, 135 F.3d 867 (2d Cir.1998). Specifically, plaintiff must show that: (1) she is a disabled person under the ADA; (2) she is otherwise qualified to perform the job; and (3) she suffered adverse employment action because of his disability. *See Heilweil v. Mt. Sinai Hosp.*, 32 F.3d 718, 721–22 (2d Cir.1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995) (decided under the Rehabilitation Act); *see also Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 762 (5th Cir.1996). In this case, we find that plaintiff has not carried her *prima facie* burden of proving that she was disabled under the ADA.

"Disability" is defined by the ADA as: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). In this case, plaintiff claims that her wrist injury, with its attendant lifting and pushing restrictions, and her five percent partial permanent disability rating were perceived by her employer as limiting her in the major

life activity of working.[4] With respect to the major life activity of working, the term "substantially limits" is defined as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs...." 29 C.F.R. § 1603.2(j)(3)(i); *see Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 154 (2d Cir.1998). The Second Circuit has interpreted this to mean foreclosure of a wide range of employment options within the employee's field and foreclosure generally of the type of employment involved. *Heilweil*, 32 F.3d at 724; *Dipol v. New York City Transit Auth.*, 999 F.Supp. 309, 314 (E.D.N.Y.1998).

 Plaintiff has failed to show that her disability prevented her from doing a wide range of employment options. She testified that she could perform all of her job duties until her lay-off. She has also worked as a laborer since her termination. Therefore, we find that she has failed to carry her *prima facie* burden of proving that she was disabled within the meaning of the ADA and grant summary judgment in defendant's favor on Count III of plaintiff's complaint.

### IV. Counts IV and V—Retaliation

Plaintiff's fourth count alleges that defendant retaliated against her for having complained of discrimination and her opposition to unlawful employment practices in violation of Title VII. Plaintiff's fifth count alleges that defendant discharged her in retaliation for her objections and other opposition to defendant's unlawful employment practices, in violation of Title VII.

 In order to establish a *prima facie* case of retaliation, plaintiff must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity

---

**4.** "Major life activities" is defined by the regulations to include functions such as "caring for oneself, performing manual tasks, walk-ing, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

and the adverse employment action. *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996). The allocation of burdens of proof in a retaliation case follows the general rules enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Id.*

As an increasing number of courts in this Circuit have done, this Court will assume for purposes of this motion that plaintiff has met her *prima facie* burden under *McDonnell Douglas* and will proceed to the ultimate issue of whether defendant's proffered reasons for plaintiff's layoff were "merely a pretext" for retaliation. *See Fierro v. Saks Fifth Avenue,* 13 F.Supp.2d 481, 488 (S.D.N.Y.1998) (citing cases that have bypassed the "much criticized minuet or burden shifting analysis of *McDonnell Douglas* ").

■ Plaintiff has failed to produce any evidence that her lay-off was causally connected to her complaints of discrimination or the filing of her CCHRO charges of discrimination. She speculates that there might be a connection, but that is not enough to get around defendant's proffered nondiscriminatory reasons for choosing plaintiff for lay-off. Indeed, defendant takes the unrefuted position that, because of the pending CCHRO complaints, it hesitated in laying off plaintiff and did so only with the approval of its legal department. Plaintiff also claims that she was more qualified than other individuals who were not laid off in that she had a security clearance, she had more seniority, and she had more training. As noted above, a security clearance was no longer required in most areas at Windsor Site, and lay-offs were not required to be based upon seniority. The evidence proffered by defendant shows that plaintiff was clearly less qualified than other laborers. Moreover, plaintiff's subjective evaluation of her qualifications is insufficient to raise a question of fact as to the legitimacy of defendant's proffered reasons for having selected her for lay-off. *Goenaga v. March of Dimes*

*Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995). We find that plaintiff has failed to produce sufficient evidence to refute defendant's legitimate reasons for her lay-off and, therefore grant defendant's motion for summary judgment as to Counts IV and V.

## V. Count VI—Intentional Infliction of Emotional Distress

In her sixth count, plaintiff alleges intentional infliction of emotional distress by defendant. She alleges in conclusory fashion that defendant's conduct was extreme and outrageous and that defendant not only failed to stop the harassment, but actively participated in the fostering of an environment that permitted and accepted plaintiff's distress.

■ Under Connecticut law, to state a cause of action for intentional infliction of emotional distress, a plaintiff must allege that: (1) the defendant intended or knew that emotional distress would likely result from its conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused plaintiff distress: and (4) that plaintiff's distress was severe. *Vorvis v. Southern New England Telephone Co.,* 821 F.Supp. 851, 855 (D.Conn.1993), (*citing Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986)).

■ In interpreting what constitutes "extreme and outrageous" conduct, Connecticut courts have relied on the Restatement (Second) of Torts § 46, comment (d) (1965), which provides: "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See DeLaurentis v. City of New Haven,* 220 Conn. 225, 266–67, 597 A.2d 807 (1991); *Petyan v. Ellis,* 200 Conn. at 254 n. 5, 510 A.2d 1337. Whether a defendant's conduct rises to the level of being "extreme and outrageous" is a question to be determined by the court in the

first instance. *See, e.g., Johnson v. Chesebrough–Pond's USA Co.*, 918 F.Supp. 543, 552 (D.Conn.), *aff'd*, 104 F.3d 355, 1996 WL 734043 (2d Cir.1996).

 The threshold issue is whether plaintiff has alleged extreme and outrageous conduct by the defendant. Here, plaintiff has not alleged that any of the employment actions taken by defendants were done in a manner so egregious or oppressive as to rise to the level of extreme and outrageous conduct. She has not alleged any intentional conduct by the management employees of defendant. Her claims of outrageous conduct pertain to behavior of her co-workers and the alleged negligent failure of defendant to prevent the harassment. Defendant's alleged negligent failure to prevent sexual harassment of plaintiff by her co-workers does not rise to the level of intentional, extreme and outrageous conduct that would support a claim for intentional infliction of emotional distress. We hold that plaintiff has failed to allege conduct on the part of any defendant from which a reasonable jury would be permitted to infer that defendant's conduct was sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. *See Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1242 (2d Cir.1995); *Johnson v. Chesebrough–Pond's*, 918 F.Supp. at 553; *Kintner v. Nidec–Torin Corp.*, 662 F.Supp. 112, 114 (D.Conn.1987); *Jewett v. General Dynamics Corp.*, No. 530943, 1997 WL 255093, at \*7 (Conn.Super. May 7, 1997). Accordingly, we grant the defendant's motion for summary judgment as to Count VI.

## VI. Count VII—Negligent Supervision

 In her last count, plaintiff alleges that defendant should have known of the "extreme emotional distress that plaintiff was being caused" and, "although having the authority [defendant's management] failed to adequately supervise offending employees to end the harassment." (Compl.¶ 52). This failure, plaintiff contends, is actionable negligent supervision under the tort law of the State of Connecticut. Plaintiff has failed to address this count in her opposition to the motion for summary judgment. Defendant maintains that under Connecticut law an employer may not be held liable for negligent supervision of co-workers who engage in sexual harassment of the plaintiff. We have found no state-law authority for allowing plaintiff to proceed on this theory under circumstances such as this, and plaintiff has cited no caselaw that would persuade us otherwise. Accordingly, we grant defendant's motion for summary judgment on Count VII.

## VII. Punitive Damages

 Last, defendant seeks summary judgment on plaintiff's claim for punitive damages, arguing that, because it had a written sexual harassment policy in place and responded adequately to plaintiff's harassment complaint, it cannot be liable for punitive damages, citing *Reynolds v. CSX Transportation, Inc.*, 115 F.3d 860, 869 (11th Cir.1997). The 1991 Amendments to the Civil Rights Act added punitive damages as a remedy available for violations of Title VII "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The Second Circuit in *Luciano v. Olsten Corp.*, 110 F.3d 210, 219 (2d Cir.1997), held that the Civil Rights Act of 1991 was not intended to limit the availability of punitive damages to cases of "extraordinarily egregious" conduct. While we have substantial doubt as to whether plaintiff will be able to carry her burden at trial of proving that defendant acted with "reckless indifference" to her federally protected rights, at this stage of the proceedings we are hesitant to grant summary judgment on this aspect of plaintiff's damages claim. *See Jonasson v. Lutheran Child and Family Services*, 115

F.3d 436 (7th Cir.1997); *Walker v. AMR Services Corp.,* 971 F.Supp. 110, 117 (E.D.N.Y.1997). Certainly, defendant's EEO policies and practices will weigh heavily against an award of punitive damages. Therefore, the Court will deny defendant's motion for summary judgment as to plaintiff's claim for punitive damages on Count I of her complaint.

## CONCLUSION

Therefore, for the reasons set forth above, this Court grants defendant's Motion for Summary Judgment [**Doc. # 19**] is GRANTED as to Counts II through VII. Defendant's Motion for Summary Judgment is DENIED as to Count I and as to plaintiff' claim for punitive damages with respect to Count I.

SO ORDERED.